**BARRY W. RASHKOVER (BR-6413)**
**ASSOCIATE REGIONAL DIRECTOR**

**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Northeast Regional Office**
**233 Broadway**
**New York, N.Y. 10279**
**(646) 428-1856**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 0 8 2004 ★

**BROOKLYN OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

NSP

---------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                          Plaintiff,     :
                                         :
          -against-                      :        04 1463
                                         :   ___ Civ. ____ (I.L.G.)
IRA ZAR,                                 :
                                         :        **COMPLAINT** GLASSER, J.
                                         :
                          Defendant.     :        AZRACK, J.

---------------------------------------------------------------X

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Ira Zar ("Zar" or "Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1.      While serving as Chief Financial Officer ("CFO") at Computer Associates

International, Inc. ("CA"), defendant Zar participated in a widespread practice that resulted in the

improper recognition of revenue by CA, one of the world's largest software companies. During

at least CA's fiscal year 2000, which ran from April 1, 1999 through March 31, 2000

("FY2000"), CA prematurely recognized revenue from software contracts that had not yet been

consummated, in violation of Generally Accepted Accounting Principles ("GAAP"). Through

the conduct of certain members of CA management, including Zar, CA held its books open for

several days after the end of each quarter to improperly record in that quarter revenue from

contracts that were not executed by customers or CA until several days or more after the expiration of the quarter (the "Extended Quarters practice"). CA often concealed this practice by using licensing contracts that falsely bore preprinted signature dates for the last day of the quarter that had just expired, rather than the subsequent dates on which the contracts actually were executed.

2.    As a result of this improper practice, CA made material misrepresentations and omissions about its revenue and earnings in Commission filings and other public statements for at least FY2000. For the First, Second, Third and Fourth Quarters of FY2000, respectively, at least 18% 33%, 26% and 7% of CA's reported quarterly revenues pertained to contracts not executed by CA or the clients by the quarter's end. For all quarters of FY2000 combined, CA prematurely recognized over \$1.4 billion in revenue from at least 116 contracts that the client or CA signed after the quarter close. CA's FY2000 reported revenues and earnings per share appeared to meet or exceed the consensus estimates of Wall Street analysts, but CA failed to disclose that those reported results improperly included prematurely recognized revenue and did not comply with GAAP. When CA apparently refrained from recognizing revenue prematurely during the First Quarter of FY2001, the company missed its earnings estimate and CA's stock price dropped over 43% in a single day.

3.    Zar, as CFO, helped orchestrate CA's improper revenue recognition in FY2000 by directing the improper extensions of fiscal quarters, and by signing and overseeing the preparation of CA's Forms 10-Q and Form 10-K while aware that those filings reported revenue improperly under GAAP. Zar also backdated his own signature on a large customer contract and authorized the backdating of other contracts.

2

## VIOLATIONS

4.    By virtue of the conduct alleged in this Complaint: Zar, directly or indirectly, singly
or in concert, has engaged in acts, practices and courses of business that constitute violations of
Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.
§§ 78j(b), 78m(b)(5); and Rules 10b-5, 13b2-1, and 13b2-2 ,17 C.F.R. §§ 240.10b-5, 240.13b2-1
and 240.13b2-2; and Zar, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), is
also liable for aiding and abetting CA's violations of Sections 10(b), 13(a) and 13(b)(2)(A) and
13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B),
and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1,
and 240.13a-13 thereunder.

5.    Unless Zar is permanently restrained and enjoined by this Court, he will again engage
in the acts, practices, and courses of business set forth in this Complaint and in acts, practices,
and courses of business of similar type and object.  By this action, the Commission seeks
judgment, among other things:  (a) permanently enjoining Defendant from engaging in the acts,
practices and courses of business alleged herein, pursuant to Section 21(d) of the Exchange Act,
15 U.S.C. §78u(d); (b) requiring Defendant to disgorge any and all ill-gotten gains together with
prejudgment interest; (c) requiring Defendant to pay civil money penalties pursuant to Section
21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) barring Defendant from serving as
an officer or director of any publicly held company pursuant to Section 21(d)(2) of the Exchange
Act, 15 U.S.C. § 78u(d)(2).

## JURISDICTION AND VENUE

6.    The Commission brings this action pursuant to the authority conferred upon it by
Section 21 of the Exchange Act, 15 U.S.C. § 78u, seeking to restrain and enjoin permanently the

Defendant from engaging in the acts, practices, and courses of business alleged herein, and seeking civil penalties and other relief.

7.    The Defendant, directly and indirectly, has used the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

8.    Certain of these transactions, acts, practices and courses of business occurred in the Eastern District of New York, including conduct by the Defendant while at CA's corporate headquarters in Islandia, New York.

9.    Accordingly, this Court has jurisdiction over this action, and venue is proper in this district, pursuant to Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

## DEFENDANT

10.    **Zar**, age 42, resides in the Town of Oyster Bay, New York. He was CA's CFO from June 1998 until October 8, 2003. He first joined CA after graduating from CUNY's Baruch College with a Bachelor's degree in business administration in 1982. During his tenure at CA, he held various positions including controller (for the United States territory), international controller, manager of financial reporting, treasurer, and the head of the Sales Accounting Department. He was a member of the Revenue Recognition task force of the American Institute of Certified Public Accountants ("AICPA"). Zar, as CFO, had primary responsibility for preparing financial statements and determining whether CA had met its earnings numbers for a quarter or a year. At the request of CA, Zar tendered his resignation on or about October 8, 2003 after the Audit Committee uncovered evidence that Zar had participated in the Extended Quarters practice.

4

## OTHER RELEVANT PERSONS

11.    **CA** is a Delaware corporation headquartered in Islandia, New York. According to

CA's Form 10-K Annual Report for the fiscal year ended March 31, 2003 ("2003 10-K"), CA

"design[s], market[s], and license[s] computer software products that allow businesses to run and

manage critical aspects of their information technology operations and that allow data center

managers and programmers to automate their daily functions." CA is one of the largest

computer software companies in the world; according to its 2003 10-K, more than 95% of the

Fortune 500® companies use its software products. CA's common stock trades on the New York

Stock Exchange and is registered pursuant to Section 12(b) of the Exchange Act, 15 U.S.C.

§78l(b). Computer Associates' fiscal year concludes at the end of each March. Many of the

events alleged in this complaint took place during CA's FY2000, which ran from April 1, 1999

through March 31, 2000.

## DEFENDANT'S ROLE IN CA'S ACCOUNTING FRAUD

12.    By FY2000, a widespread practice had developed at CA that allowed for the

premature recognition of revenue from software licensing agreements. Pursuant to this practice,

referred to in this Complaint as the "Extended Quarters practice," CA personnel recorded, into

the just-elapsed fiscal quarter, revenue from software contracts that were not finalized and signed

until days or weeks after that quarter ended. Reporting revenue in this fashion was improper

because it violated GAAP, which required that license agreements be fully executed and final

before recognizing revenue. CA's reported revenue and earnings per share appeared to meet or

exceed Wall Street analysts' expectations, when – in truth and fact – those results were built in

part on revenue that CA recognized prematurely and in violation of GAAP. During at least

FY2000, Zar, as CFO, helped CA engage in these improper revenue recognition practices.

5

13.   In 2003, CA announced that the Audit Committee of its Board of Directors was

conducting an inquiry into the timing of revenue recognition at the company. In a press release

dated October 8, 2003, CA announced what it described as "preliminary results" of that inquiry.

Quoting Walter P. Schuetze, the chair of the Audit Committee, that press release stated, among

other things, that:

> "The Audit Committee's investigation is continuing, but we have
> determined that CA recognized certain revenue prematurely in the
> fiscal year ending March 31, 2000. The committee found that a
> number of software contracts in that fiscal year appear to have
> been signed after the end of the quarter in which revenues
> associated with such contracts had been recognized. Those
> revenues should have been recognized in the quarter in which the
> contract was signed."

In that same press release, CA announced that CA had asked for and received the resignations of

those who, according to CA, "oversaw sales accounting during the relevant time" including,

among others, Zar.

## Improper Revenue Recognition at CA

14.   During the time period relevant to this Complaint, including but not limited to

FY2000, CA derived its income primarily from licensing software and providing maintenance

for that software. CA's software has operated and maintained powerful "mainframe" computers,

those generally used by businesses and other organizations. Prior to October 2000, CA's

contract and licensing model involved entering into long-term licensing contracts, some as long

as seven years in duration. Under that business model, customers paid an initial licensing fee for

the software, plus subsequent licensing fees for the right to use the software in subsequent years.

In addition, customers paid CA for ongoing maintenance such as technical support. Customers

often entered into long-term contracts and spread out the licensing and maintenance fees over the

6

term of the contract.

15.    For contracts under its pre-October 2000 business model, GAAP allowed CA to recognize all the license revenue called for during the duration of the contract up front, during the fiscal quarter in which the software was shipped and the contract was executed and final. SOP 97-2, which the AICPA adopted in October 1997, requires the following before revenue can be recognized from a software sale:

- evidence of an arrangement;
- delivery;
- fixed and determinable fees; and
- ability to collect.

Where a company uses contracts requiring signatures by the licensor and licensee, then SOP 97-2 says that both signatures – the licensor and the customer – are required as "evidence of an arrangement" before the company may recognize revenue. During the period relevant to this Complaint, including but not limited to CA's FY2000, all of CA's license agreements required signatures by both CA and the customer.

16.    During at least FY2000, CA violated GAAP, including SOP 97-2, by recording into fiscal quarters that had expired software contracts that were not executed – and for which "evidence of an arrangement" did not exist – until a subsequent quarter.  This Extended Quarters practice resulted in CA's premature recognition of revenue.  As a consequence, CA made material misrepresentations and omissions of fact concerning CA's revenues and earnings for FY2000 in various public documents and in connection with the purchase and sale of securities. CA's reported results for FY2000 appeared to meet or exceed the revenue and earnings estimates of outside analysts when, in fact, those reported results did not comply with GAAP and were

7

false and misleading.

17.     Specifically, CA made the following misrepresentations and omissions about its revenue and earnings per share.

a.     **First Quarter FY2000.** In its Form 10-Q quarterly report for the First Quarter of FY2000 (quarter ended June 30, 1999) and in a press release dated July 20, 1999, CA represented that its total revenue for the quarter amounted to approximately $1.222 billion. In that Form 10-Q, CA represented that its earnings per share totaled a loss of $0.80 per share (diluted basis). Analysts surveyed by First Call estimated, on average, that CA would achieve $0.47 per share earnings for its First Quarter of FY2000. In its July 20, 1999 press release CA represented that its results included amortization expenses and a $646 million charge related to CA's purchase of another company. Excluding these charges, CA represented that it earned $0.49 a share, beating the mean analyst estimate. CA's reported and announced revenue and earnings per share results were false and misleading. CA recorded as revenue for the First Quarter of FY2000 several contracts that CA's customers executed after June 30, 1999. The GAAP value of these contracts totaled at least $16 million. Additionally, CA executed, well after the First Quarter of FY2000, several other contracts with a GAAP value totaling at least $207 million. Thus, CA improperly recorded at least $223 million of GAAP revenue in the First Quarter of FY2000, representing at least 18% of all reported gross revenue. Because CA prematurely recorded revenue into the First Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-Q for the First Quarter of FY2000 and July 20, 1999 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the First Quarter of FY2000.

8

      b.     **Second Quarter FY2000.** In its Form 10-Q quarterly report for the Second

Quarter of FY2000 (quarter ended September 30, 1999) and in a press release dated October 19,

1999, CA represented that its total revenue for the quarter amounted to approximately $1.605

billion. In that Form 10-Q, CA represented that its earnings per share totaled $0.60 per share

(diluted basis). In its press release dated October 19, 1999, CA also announced earnings per

share of $0.60 (diluted basis) but also represented that its "[s]econd quarter operating earnings

per share (diluted) excluding acquisition related amortization charges, was $[0].75, [per share]

compared to $[0].58 a year ago, an increase of 29%." Analysts surveyed by First Call estimated,

on average, that CA would achieve $0.59 per share earnings for its Second Quarter of FY2000.

CA's reported and announced revenue and earnings per share results were false and misleading.

CA recorded as revenue for the Second Quarter of FY2000 several contracts that CA's customers

executed after September 30, 1999. The GAAP value of these contracts totaled at least $450

million. Additionally, CA executed, well after the Second Quarter of FY2000, several other

contracts, with a GAAP value totaling at least $80 million. Thus, CA improperly recorded at

least $530 million of GAAP revenue in the Second Quarter of FY2000, representing at least 33%

of all reported gross revenue for that quarter. Because CA prematurely recorded revenue into the

Second Quarter of FY2000, its reported earnings per share also were false. CA omitted to

disclose, in its contemporaneous Commission filings and press releases including but not limited

to its Form 10-Q for the Second Quarter of FY2000 and October 19, 1999 press release, that its

reported quarterly revenue was inconsistent with GAAP and included revenue that was not

appropriately recorded in the Second Quarter of FY2000.

      c.     **Third Quarter FY2000.** CA also improperly recognized revenue from late-

signed contracts in the Third Quarter of FY2000. In its Form 10-Q quarterly report for the Third

9

Quarter of FY2000 (quarter ended December 31, 1999) and in a press release dated January 26, 2000, CA represented that its total revenue for the quarter amounted to approximately $1.81 billion. In its Form 10-Q for that quarter, CA represented that its earnings per share amounted to $0.72 (on a diluted basis). In its press release dated January 26, 2000, CA represented that its "[t]hird quarter operating earnings per share (diluted) was $[0].91, compared to $[0].71 a year ago, an increase of 28%, excluding acquisition related amortization charges and a one time non-cash asset write-down of $37 million." Analysts surveyed by First Call estimated, on average, that CA would achieve $0.90 per share earnings for its Third Quarter of FY2000. CA's reported and announced revenue and earnings per share results were false and misleading. CA recorded as revenue for the Third Quarter of FY2000 contracts that both CA and the customers executed after the end of December 1999. The GAAP value of these contracts totaled approximately $350 million. CA also recorded, as revenue for the Third Quarter of FY2000, at least approximately $130 million in GAAP revenue from contracts CA executed after the Third Quarter of FY2000. Thus, CA improperly recorded at least approximately $480 million of GAAP revenue in its Third Quarter of FY2000, representing at least 26% of CA's reported gross revenue for that quarter. Because CA prematurely recorded revenue into the Third Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-Q for the Third Quarter of FY2000 and January 26, 2000 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the Third Quarter of FY2000.

        d.    **Fourth Quarter FY2000.** CA also improperly recognized revenue in the Fourth Quarter of FY2000 (quarter ended March 31, 2000). In its Form 10-K Annual Report for

FY2000, and in a press release dated May 15, 2000, CA represented that its total revenue for the Fourth Quarter of FY2000 amounted to $2.127 billion. In that Form 10-K Annual Report, CA represented that earnings per share for the Fourth Quarter of FY2000 amounted to $0.70 (diluted basis). In a press release dated May 11, 2000, CA stated "it expects financial results for the fourth quarter ending March 31, 2000 to be in line with consensus estimates." In its press release dated May 15, 2000, CA represented that, for the Fourth Quarter of FY2000, "[o]perating earnings per share (diluted) increased 26% to $1.13 from last year's $.90, excluding the Sterling acquisition charge, other acquisition amortization charges and the one time non-cash charge." CA's reported revenue and announced earnings per share results were false and misleading. CA recorded as revenue for the Fourth Quarter of FY2000 several contracts that actually were executed by CA and the customers after the end of March 2000. The GAAP value of these contracts totaled approximately $120 million. CA executed one other contract after the quarter and recognized approximately $45 million in GAAP revenue from that contract. Thus, CA improperly recognized as revenue over about $165 million of GAAP revenue in the Fourth Quarter of FY2000, representing at least 7% of all reported gross revenue for that quarter. Because CA prematurely recorded revenue into the Fourth Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-K for FY2000 and May 15, 2000 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the Fourth Quarter of FY2000.

     e.    **Year End FY2000.** CA's Form 10-K for FY2000 was inaccurate and misleading also in that it (a) repeated false statements about CA's quarterly results as reported in the Form 10-Qs for the First, Second and Third Quarters, as set forth in paragraph 17(a) through (c) above;

(b) contained false statements about the company's annual revenue and earnings results; and (c) failed to disclose the Extended Quarters practice. CA also misstated the company's annual earnings per share in its Form 10-K Annual Report for FY2000. The $165 million in contract revenue referenced in paragraph 17(d) above was not only improper revenue for the Fourth Quarter of FY2000, but also for FY2000 as a whole. By reporting that CA's revenue for FY2000 was $6.103 billion, CA's Form 10-K for FY2000 was false and misleading. Because CA prematurely recorded revenue into FY2000, its reported earnings per share for FY2000 also were false.

18.     The premature recognition of revenue at CA during at least FY2000 was the result of a systemic, intentional practice by certain CA personnel. To implement and conceal this Extended Quarters practice, CA personnel employed a variety of improper techniques, many of which rendered the company's books and records false and misleading. Indicia of this are:

a.      Some employees at CA called the Extended Quarters practice the "35-day month" practice, because generally most quarters were extended by at least 3 business days, although some quarterly extensions lasted longer.

b.      Sometimes, CA had its customers execute contracts bearing pre-printed dates from the just expired quarter even though the customer did not actually sign the contract until days or weeks into the new quarter.

c.      Other times, even when the customer signed the contract before quarter end, CA did not execute the contract until the following quarter.

19.     CA did not prematurely record revenue for software contracts during the First Quarter of FY2001 (quarter ended June 30, 2000). That quarter, CA missed its quarterly earnings estimates. CA issued a press release on July 3, 2000 stating that it would miss the analysts'

12

estimates, specifically citing the fact that the company did not complete several large contracts that they had hoped to conclude before the close of the quarter. This was only the second time in CA's then recent history that CA missed Wall Street's estimates. The next trading day, July 5, 2000, CA's stock dropped over 43% from $51.12 to $28.50 as the market reacted to the news. Subsequent days of trading brought negligible gains.

## Zar's Misconduct

20.     During the period relevant to this Complaint, including but not limited to CA's FY2000, Zar was CA's CFO, and head of CA's entire Finance Department. As CFO Zar helped CA improperly recognize revenue during at least April 1999 through April 2000. Specifically, Zar: (1) oversaw and implemented the Extended Quarters practice, (2) personally backdated the date of his signature on a contract of significant value and directed a subordinate to backdate the date of that subordinate's signature on several contracts, and (3) oversaw the filing of a false Form 10-K and false Forms 10-Q with the Commission.

### a.      Zar Oversaw and Implemented the Extended Quarters Practice

21.     Zar determined how long to keep quarters open and ordered his staff to continue to recognize revenue from contracts signed after the end of a quarter.

22.     Zar determined how long he could hold open a quarter by working backwards from the date when CA released its financials. Zar often conferred with CA Executive A and CA Executive B as to how on target CA was towards reaching its quarterly revenue goals. Towards the end of the each fiscal quarter and the beginning of the next fiscal quarter, Zar conferred with CA Executives A and B and all three, including Zar, were aware that the fiscal quarters were being extended. When the revenue target was reached, Zar would tell CA's Sales Accounting Department to stop receiving and booking contracts into the just-elapsed quarter.

13

23.     According to CA Executive C, Zar decided how long to extend quarters to recognize revenue. According to CA Executive C, he only closed the books after Zar instructed him. When Zar wanted to close the books, he would say to CA Executive C, "we're good" or "we're done." Zar and other CA Executives kept the books open after the close of the quarter lasted until CA had received enough revenue to meet its Wall Street earnings estimates. Zar and CA Executives D and E communicated to the sales managers and other personnel how long the books would stay open.

24.     Zar and other CA's senior staff used internally generated "Status Reports" and "Missing Reports" to keep track of the sales force's progress in consummating particular contracts during the quarter. Senior management each quarter received, from data in CA's computerized Total Order Processing System ("TOPS"), Status Reports identifying particular license agreements that the Company needed to consummate to achieve and surpass the quarterly targets, and charting the status of those expected contracts. At the end of the quarter and, separately, during the early days of the new quarter, senior management, including Zar, received "Missing Reports" identifying, from the Status Reports, the particular contracts that were not yet finalized, or that had been finalized the preceding day. Through the Status Reports and Missing Reports, senior management could identify, as the quarter drew to a close and ended, specific contracts that the sales force still needed to finalize for CA to meet its revenue and earnings per share targets. Zar and other senior managers received the Status Reports.

25.     Documents confirm that Zar oversaw the extensions of fiscal quarters. For example, in an email dated December 29, 1998, CA Executive E wrote on December 29, 1998 to CA Executive C and D, saying, "I spoke w/ Ira [Zar] about close date next week; because of the way holidays fall, finance has an extremely tight deadline to get qtr closed to report earnings on time

14

so we ask that you inform the field that Tuesday, January 5 will be the last day of business for December." Similarly, an email dated February 8, 2000 sent by CA Executive E to Sales Accounting and Zar with the subject line "Contract Signing Prep" corroborates Zar's knowledge of CA's practice of preparing contracts for CA employees and its customers to sign with signature dates typed into contract bearing the last day of the month of the quarter. The email read, "All, Effective immediately, when having admin's prep original contracts for SA signature, please ensure dates typed in CA signature block is the same date as typed/written in Licensee signature block (i.e., last day of month/quarter)."

26.     Zar also misled CA's outside auditors regarding CA's Extended Quarters practice. The Completion Memorandum by CA's outside auditors for the fiscal year ended March 31, 2000 does not reflect any attempt by Zar to make CA's outside auditors aware that CA was still incorrectly recognizing revenue. Initially, CA's outside auditors observed that CA signed contracts after the end of the quarter, but concluded that during the period of the audit, CA tightened its compliance and that "the Company complied with this practice at year-end and has committed to continue to comply with this practice in future periods." Zar misled CA's outside auditors and its accountants by not disclosing that CA engaged in the Extended Quarters practice and that contracts were signed by customers after the end of the fiscal quarter in which the revenue from such contracts were recorded.

### b.     Zar's Backdating of Contracts

27.     In October 1999, Zar backdated his signature on a contract with a customer (Customer X) worth over $65 million in recorded revenue so that it appeared that he signed the contract on September 30, 1999. The contract was then incorrectly booked in the second quarter of FY2000.

15

28.     Zar also had direct responsibility for incorrectly booking in the Third Quarter of FY2000 a significant contract which CA did not obtain until the Fourth Quarter of FY2000: CA's contract with another customer (Customer Y) with GAAP value of more than $100 million. CA's contract with Customer Y, although bearing a clause indicating it was executed on December 31, 1999, actually bears fax date stamps of January 6, 2000 and was executed by Customer Y in January 2000. The contract, which Zar received from CA Executive B in early January 2000 and delivered to Sales Accounting, actually bore CA Executive B's signature but no date. Zar allowed CA to recognize revenue from the contract with Customer Y to be booked in the Third Fiscal Quarter of FY2000 (ended December 31, 1999), even though Zar knew, or recklessly disregarded the fact, that CA and Customer Y had not executed that contract until after December 31, 1999.

29.     In April 2000, Zar approved and allowed CA Executive A to backdate and sign at least seven contracts with GAAP value totaling greater than $157 million, so that it appeared that CA obtained those contracts in the Fourth Quarter of FY2000 (ended March 31, 2000). Zar also allowed CA to book revenue from those contracts in the Fourth Quarter of FY2000, even though he knew, or recklessly disregarded the fact, that CA had not obtained those contracts until April 2000. By approving and allowing CA Executive A to backdate these seven contracts, Zar had the intent to both falsify CA's books and records and mislead CA's outside auditors.

c.     **Zar Oversaw the Preparation and Filing of False and Misleading Forms 10-Q and a Form 10-K For FY2000**

30.     Zar oversaw the preparation of the false financial statements, discussed above, that CA included in the Forms 10-Q and Form 10-K for FY2000. Zar, as CFO, also signed those Forms 10-Q and Form 10-K while knowing, or recklessly disregarding the fact, that they

16

contained false statements regarding CA's recorded revenue and earnings for those periods and CA's compliance with GAAP.

31.     Zar knew, or recklessly disregarded the fact, that CA obtained its revenue in various fiscal quarters of FY2000 from contracts which executed by customers or CA after those fiscal quarters.

32.     Zar oversaw the implementation of the Extended Quarters practice, as such, he was aware that the Forms 10-Q and Form 10-K he signed contained false and misleading revenue and earnings results and did not comply with GAAP.

33.     Zar was also ultimately responsible for the false financial statements prepared by the Financial Reporting Department. Zar supervised the work of CA Executive C, which involved preparing financial statements for inclusion in CA's filings with the Commission of Forms 10-Q and 10-K. CA Executive C and Zar discussed the need to abolish the Extended Quarters practice but never took satisfactory steps to do so during the relevant period.

### d.     Zar Obstructed the Investigations of CA's Outside Counsel, CA's Audit Committee, and the SEC, USAO and FBI

34.     CA Executives C and E met with Zar before their interviews with CA's outside counsel in May and August 2002 respectively. Zar suggested to both of them that they tell CA's outside counsel that CA kept the books open for several days after quarter end only to process paperwork from contracts that had been completed by quarter end. When CA Executive D sought Zar's advice on the issue, Zar indicated to him that CA Executive D should not disclose the Extended Quarters practice to the government when interviewed.

35.     Later, Zar made false statements to the outside counsel for the audit committee of CA's Board of Directors during his own interview with them on October 3, 2003. Zar falsely

17

told that counsel that: (1) he believed during FY2000 that all license agreements recognized as revenue in a given quarter were signed by the customer prior to the end of that quarter; (2) Zar was unaware that anyone at CA encouraged the backdating of contracts or the use of preprinted client signature dates; and (3) Zar did not use the Missing Reports for "much of anything."

### FIRST CLAIM FOR RELIEF

**Section 10(b) of the Exchange Act,**
**15. U.S.C. § 78j(b), and Rule 10b-5,**
**17 C.F.R. § 240.10b-5, thereunder**

36.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 35.

37.     Zar, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of CA securities, knowingly or recklessly, has: (a) employed, is employing or is about to employ, devices, schemes and artifices to defraud; (b) made, is making or is about to make untrue statements of material fact, or has omitted, is omitting, or is about to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged, is engaging and is about to engage in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of CA securities and upon other persons, including in CA's Commission filings for FY2000 including the Form 10-K and Forms 10-Q for the First, Second and Third Fiscal Quarter and in other public statements.

38.     By reason of the foregoing, Zar, singly or in concert, directly or indirectly, has

18

violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Rule 10b-5, 17 C.F. R. § 240.10b-5, thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of The Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, thereunder

39.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 35.

40.     Exchange Act Section 13(b)(5) states that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in Exchange Act Section 13(b)(2). Exchange Act Rule 13b2-1 prohibits any person from directly or indirectly, falsifying or causing to be falsified, an issuer's books and records.

41.     By reason of the foregoing, Zar has violated, and unless enjoined, will again violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2

42.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 35.

43.     Exchange Act Rule 13b2-2 prohibits any officer or director of an issuer from making, or causing to be made, a material misstatement or omission to an accountant in connection with any audit or examination of the issuer's financial statements, or the preparation of documents or reports required to be filed with the Commission.

19

44.    Zar made, or caused to be made, materially false and misleading statements or omissions to CA's outside auditors in connection with their audits of CA's financial statements and/or the preparation of CA's Forms 10-K and Form 10-Q for FY2000.

45.    By reason of the foregoing, Zar has violated, and unless enjoined, will again violate Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Liability for CA's Violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13, thereunder**

46.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 35.

47.    CA, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of CA securities, knowingly or recklessly, has: (a) employed, is employing or about to employ, devices, schemes and artifices to defraud; (b) made, is making or is about to make untrue statements of material fact, or has omitted, is omitting, or is about to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged, is engaging and is about to engage in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of CA securities and upon other persons. CA made untrue statements of material fact in, among other things, Commission filings for FY2000 including the Form 10-K and Forms 10-Q for the Second

20

and Third Fiscal Quarter and in other public statements.

48.    By reason of the foregoing, CA, singly or in concert, directly or indirectly, has violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

49.    Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports. Exchange Act Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading. By reason of the foregoing, CA violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13, thereunder.

50.    Section 13(b)(2)(A) of the Exchange Act requires that issuers make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer.

51.    Section 13(b)(2)(B) of the Exchange Act requires, among other things, that issuers maintain a system of internal accounting controls that permit the preparation of financial statements in conformity with GAAP. By reason of the foregoing, CA has violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

52.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Zar aided and abetted CA's violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13, and unless

21

enjoined, will again violate these provisions of the Exchange Act and Rules thereunder. Zar

knowingly provided substantial assistance to CA by, among other things, engaging in the

conduct alleged in paragraphs 1 to 35 above.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Zar, and his agents, servants, employees and attorneys and all

persons in active concert or participation with them who receive actual notice of the injunction

by personal service or otherwise, and each of them, from (a) future violations of Sections 10(b)

and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5 and

13b2-1 and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2; and (b) aiding and

abetting any issuers' future violation of Sections 10(b), 13(a), and 13(b) of the Exchange Act, 15

U.S.C. §§ 78j(b), 78m(a), and 78m(b), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§

240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13.

## II.

Ordering Zar to disgorge any and all the ill-gotten gains he received as a result of his

violations of the federal securities laws, and to pay prejudgment interest on all such gains.

## III.

Ordering Zar to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange

Act, 15 U.S.C. § 78u(d)(3).

## IV.

Permanently barring Zar from serving as an officer or director of a publicly held

company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## V.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
     April 8, 2004

                                   Barry W. Rashkover (BW-6413)
                                   Associate Regional Director

                                   Attorney for Plaintiff
                                   SECURITIES AND EXCHANGE COMMISSION
                                   Northeast Regional Office
                                   233 Broadway
                                   New York, New York 10279
                                   (646) 428-1856

*Of Counsel:*
     Edwin H. Nordlinger
     Alexander M. Vasilescu
     Danielle Friedman
     William J. Estes